# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 21, 2010 Session

## STATE OF TENNESSEE v. DOUGLAS WAYNE YOUNG

**Appeal from the Sullivan County Circuit Court**
**No. S54,663    Robert H. Montgomery, Jr., Judge**

---

**No. E2010-00027-CCA-R3-CD - Filed May 23, 2011**

---

The Defendant, Douglas Wayne Young, was convicted by a Sullivan County Circuit Court jury of especially aggravated kidnapping, a Class A felony; four counts of aggravated rape, a Class A felony; aggravated assault, a Class C felony; and aggravated burglary, a Class C felony. See T.C.A. §§ 39-13-305 (2010), 39-13-502 (2010), 39-13-102 (2006) (amended 2009, 2010), 39-14-403 (2010). He was sentenced as a Range I, standard offender to twenty-five years' confinement for especially aggravated kidnapping, twenty-five years' confinement for each aggravated rape conviction, six years' confinement for aggravated assault, and six years' confinement for aggravated burglary. The kidnapping conviction was ordered to be served consecutively to the remaining convictions, for an effective sentence of fifty years. On appeal, he contends that the trial court erred by admitting evidence of prior bad acts and by enhancing his sentence based upon enhancement factors not found by the jury or admitted by the Defendant. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

C. Brad Sproles, Kingsport, Tennessee, for the appellant, Douglas Wayne Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry Staubus and Teresa Nelson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the Defendant's breaking into his estranged wife's home, forcing her to have intercourse with him, and forcing her to accompany him as he traveled between

Tennessee, Georgia, and North Carolina. At trial, Clarence Derrick Smith testified that he and the Defendant attended high school together. He said that he saw the Defendant regularly in December 2007 and that they discussed the Defendant's separation and pending divorce from the victim. He said the Defendant told him that although he suspected she was cheating on him, he wanted to reconcile his marriage. He said the Defendant borrowed his truck four or five times and drove by the victim's home to see if she was there. He also drove by her home four or five times at the Defendant's request to see if she was there. He said the Defendant instructed him to look for her Honda, her father's white truck, and any additional cars.

Mr. Smith testified that he and the Defendant spoke several times by telephone on January 3, 2008. He said that the Defendant was crying and sounded "panicky" and that the Defendant told him he "was going to try to catch his wife." He and the Defendant made plans to eat breakfast together the next morning at the Defendant's mother's home. He said that he arrived at the Defendant's home on January 4, 2008, and that the Defendant told him they were not having breakfast with his mother. He said that the Defendant was concerned the victim was going away for the weekend and that the Defendant told him he was going to find her with the other man and take a photograph. He said that the Defendant carried a green duffel bag as they left the home but that he did not see what was in the bag. He said that they drove the Defendant's truck to the bank where the victim worked to see if she was there, that the Defendant pointed to her car in the parking lot, and that they returned to the Defendant's home. He said that the Defendant continued to discuss the victim and that he drove the Defendant to her home. He said the Defendant left the truck, took his green duffel bag, and said, "I don't know what I'm gonna do." He said that the Defendant did not request a ride later in the day, that he asked the Defendant if he was sure he wanted to be at the victim's home, and that the Defendant responded, "I've got to do it."

Mr. Smith testified that he left the victim's home and went to his aunt's home to paint her bedroom. He said the Defendant called him at 1:00 p.m. and asked him to drive by the bank to see if the victim was still at work. He said that he drove by the bank and that he told the Defendant the victim was there. He said the Defendant stated that he did not know what he was going to do and that he was "cold." He said that he asked the Defendant to assist him with painting but that the Defendant refused. He said he attempted to call the Defendant that evening but was unable to reach him. He said that he drove by the Defendant's home and saw the Defendant's truck but that it did not look like anyone was home. He called the police the next morning after learning that the Defendant and the victim were missing, spoke with the police, and provided a statement. He said he had no contact with the Defendant after January 4, 2008. He said that the Defendant did not appear to be under the influence of alcohol or drugs that morning but that the Defendant was upset and was "in a daze."

On cross-examination, Mr. Smith testified that he usually rode with the Defendant whenever he lent the Defendant his truck. He said he never saw the Defendant and the victim together. He said that after he dropped the Defendant off at the victim's home, the Defendant never asked for a ride or mentioned that Mr. Smith needed to give the Defendant a ride. He said the Defendant stated that he wanted to catch his wife because he still loved her and wanted to reconcile.

Bristol Police Detective Robert Bedwell testified that on January 5, 2008, he began investigating the disappearance of the victim. He was aware that an order had been issued before she disappeared that prohibited the Defendant from contacting her. He identified the order, signed by the Defendant and Judge William Watson on December 3, 2007. The order granted the Defendant bail in a domestic spousal abuse case and prohibited the Defendant from contacting the victim, possessing a firearm, or consuming alcohol or controlled substances.

Detective Bedwell testified that he went to the victim's home on January 5, 2008, and was met by other officers and the victim's family. He visited the bank where she worked and learned that she had not scheduled any vacation days before her disappearance. He obtained access to her work computer and learned that the victim and the Defendant had not communicated through email or voice mail. He said that on January 6, 2008, he went to the Defendant's home, which was about one and one-half miles away from the victim's home. The Defendant was not there, but his personal and work trucks were parked in the driveway. He said that the police entered the Defendant's home after obtaining a search warrant and that they found a receipt from Lowe's dated January 3, 2008, indicating that the Defendant purchased window glaze, a glass cutter, and a rubber mallet. He said they also found a firearms box and a computer tower. He said that he repeatedly attempted to call the Defendant using the victim's telephone but that he was unable to reach the Defendant.

Detective Bedwell testified that he monitored the Defendant's credit card. He said that after the card was used at a Walmart in Spartanburg, South Carolina, he traveled to the store and watched security video of the Defendant and the victim in the store. The video also showed the victim's car in the parking lot. He said a different security video showed the Defendant and the victim in a bank in Arden, North Carolina. The police investigated each location where the Defendant used his credit card, and the FBI and local sheriffs assisted in the investigation. The Defendant was arrested at Mama G's restaurant in Rabun County, Georgia, on January 11, 2008. Detective Bedwell said the police recovered a green duffel bag, a .25 caliber pistol, a .38 caliber revolver, ammunition for each gun, receipts, ratchet straps, knives, scissors, zip ties, alcoholic beverage containers, a camouflage fanny pack, and tools. He said the police often used zip ties as a hand restraint. He said the duffel bag contained window glaze, a glass cutter, a rubber mallet, a multi-tool scraper, duct tape, a

hammer, saws, wrenches, a drill, a pry bar, chisels, a hack saw, latex paint, beer bottles, and vice grips. He said the window glaze, glass cutter, and rubber mallet matched the description of items the Defendant bought from Lowe's the day before the victim disappeared. He said the multi-tool scraper was used to scrape caulk. He identified a photograph of a basement window at the victim's home and said the caulk that held the window in place was stripped away.

Detective Bedwell testified that his investigation revealed that the Defendant and the victim stayed at the Drama Inn in Cherokee, North Carolina. The room was registered under the name Marcie Wallace and listed a license plate registered to an Acura not owned by the victim. He said the police recovered clothing, food, and toiletries from the hotel room. He said the clothing matched items purchased using the Defendant's credit card at a Walmart in Spartanburg, South Carolina. He said that a police station was located three or four blocks away from the Inn but that he was only able to find the station after being told where it was. He said he did not see a sign identifying the police station.

Detective Bedwell testified that he spoke with the victim on January 13, 2008. He took photographs of her injuries and collected evidence from her home, including a pair of pants with a torn seam near the zipper, a brown hand towel, a bed comforter, and swabs from red stains in the kitchen and the hallway. He said the items were sent to the Tennessee Bureau of Investigation Crime Laboratory for analysis. He identified photographs of the victim's home and of evidence recovered from her home, her car, the Drama Inn, and the Defendant after his arrest. He also identified photographs depicting the victim at the hospital and at the police station shortly after her return to Tennessee. He said the photographs showed swelling in the victim's nose and bruising around her eyes and left cheek.

On cross-examination, Detective Bedwell testified that he was present when the FBI searched the Defendant's room at the Drama Inn. He said that he collected evidence at the victim's home and that her family was in the home before he arrived. He did not know if anyone entered her bedroom before he collected evidence. He identified a photograph of the victim's clothing in a laundry basket and said it depicted the basket exactly as he found it. He identified a Lowe's receipt recovered from the Defendant's home, reflecting that the Defendant purchased window glaze, a rubber mallet, a glass cutter, chip brushes, pliers, a cut off wheel, and black paint on January 3, 2008. He said the window glaze, a rubber mallet, and glass cutters were found in the Defendant's green duffel bag. He agreed most of the items found in the bag were tools and materials used in construction. He said zip ties could be used for construction. He identified a photograph of a basement window at the victim's home and said the window pane where the caulk was stripped away could be easily moved. He did not know if the pane could be removed because he did not try. He said that it was possible to reach the window latch if the pane were removed but that he did not know if the

Defendant removed the window pane. He agreed that he collected many pieces of evidence during his investigation and that some of the evidence, including photographs, was not introduced at trial.

The victim testified that she was married to the Defendant for ten years. She said that she filed for divorce in 2004 or 2005 but that she and the Defendant reconciled. She said that she and the Defendant separated again in 2007 and that she moved out of his home. She said that she had a court date to finalize their divorce on January 4, 2008, the day the Defendant attacked her, and that their divorce was finalized later. She said that before the attack, she had no contact with the Defendant since December 1, 2007.

The victim testified that on January 4, 2008, she left work around 1:30 p.m. She spoke with her father that day and told him she planned to go out with friends that evening. She said that her father began staying at her home on December 1, 2008, and that she spoke with him multiple times each day. She said that her home was locked, that the Defendant did not have a key to her home, and that she did not expect visitors. She later discovered that a window pane had been tampered with in her basement, allowing the pane to be removed and the window opened. She said she entered her home and saw the Defendant holding a .38 caliber revolver given to her by her father. She said that the Defendant punched her in the face after she asked him what he was doing and that she heard her nose "pop." She said the Defendant forced her down the hall and into the front bedroom at gunpoint. She said she attempted to spit blood around her home to let people know what happened to her. She said the Defendant ripped her pants off, continued hitting her, and forced her to have sex with him. She said the Defendant penetrated her vaginally, orally, and anally without her consent. She said she told the Defendant, "Please don't do this." She said that as a result of the attack, she suffered a broken nose, two black eyes, a bruised face, and an injured mouth. She subsequently had surgery to repair her broken nose.

The victim testified that she grabbed the gun from the Defendant but that he bent her fingers back and took the gun. She said the Defendant told her to clean the blood on her face, the bedspread, the kitchen walls, and in the hallway. She used a brown hand towel to clean her face and vaginal area and used Clorox wipes to clean the remainder of the blood. She said she attempted to leave some of the blood to provide clues.

The victim testified that the Defendant ordered her to change her clothes. She left her grey pants, which were torn by the Defendant, in the clothes basket. She said that the Defendant told her they were leaving and that she only brought her car keys, ChapStick, and the clothing she wore. She left her cell phone, her purse, and an epinephrine pen she always carried. She said the Defendant told her to leave the lights on when they left. She said that her face was swollen and bloody, that the Defendant told her that he would shoot her if she

ran, and that she followed the Defendant's orders. She said the Defendant placed a duffel bag in her trunk and told her that "he didn't have a lot of time" and that he wanted to spend his time with her. She said that she did not want to leave with the Defendant and that they had not planned any trips.

The victim testified that the Defendant held the gun as he drove. She said he received multiple calls on his mobile telephone but did not answer. She said the Defendant stopped the car near Banner Elk, North Carolina, pointed the gun at her, and forced her to have sex with him. They then they drove to Asheville, North Carolina, and stopped for gas. She said the Defendant held the gun in his front pocket as he pumped the gas. She said that they spent the night at a rest stop and that the Defendant tied her up using a strap and attached the strap to himself.

The victim testified that on January 5, 2008, they drove to Cades Cove in the morning and that the Defendant forced her to have sex with him at gunpoint. They then drove toward Cherokee, North Carolina. She said the Defendant told her he wanted to go to Cherokee because the Indian reservation was isolated and did not cooperate with outside law enforcement agencies. She said that as they drove, the Defendant told her to memorize the license plate of a car in front of them. She said they arrived at the Drama Inn, and the Defendant told her to reserve a room using the other car's license plate and the name "Marcie." She said that the Defendant stood beside her as she checked in and that he showed her eight bullets in the gun and said, "If you do anything, the first 4 are for you." She said she did not tell anyone at the motel she was being held against her will because she was scared the Defendant would kill her. She said that she could not make any telephone calls and that the Defendant removed the telephone from the room and placed it in the car. She said the Defendant forced her to have sex with him that night. She said the Defendant took her clothes and made her sleep nude to prevent her from running. She said the Defendant tied her up using a ratchet strap and attached the strap to the bedpost and to himself as they slept. She said she did not ever see the police station in Cherokee.

The victim testified that she was still confined when she woke up the next morning. She said that the Defendant was already awake, that he told her they needed supplies, and that they drove to a Walmart in Spartanburg, South Carolina. She said that she used an ATM in the store and looked directly into the surveillance camera and that they bought clothing and food. She said she did not run or attempt to find help because each time they left her car, the Defendant showed her the gun and said, "The first 4 bullets are for you." She said they bought a pizza and returned to the Drama Inn. She said the Defendant forced her to have sex with him that night. She said that the Defendant did not tie her up that night but that he told her he would hold the gun as he slept.

The victim testified that the Defendant was awake and holding the gun when she woke up the next morning. She said that they drove to a BB&T bank in Asheville, North Carolina, and that the Defendant told her to wear sunglasses in the bank because her face was swollen and bruised. She said that they bought a deck of cards and that she played rummy with the Defendant to calm him down. She said that she began to feel sick that night and that the Defendant told her he would let her rest and not have sex. She said that the Defendant did not tie her up that night but that he showed her the gun and said, "You know what's going to happen if you try to run."

The victim testified that they went to a laundromat the next morning and that the Defendant carried the gun. She said the Defendant bought a pint of Jack Daniel's Whiskey and a fifth of vodka and drank all day. She said that the Defendant forced her to have sex with him that night but that he did not tie her up when they slept.

The victim testified that on January 9, 2008, the Defendant began drinking vodka early in the morning but never passed out. She said they drove to Regions Bank in Clayton, Georgia, and withdrew $800.00. They then drove to Gainesville, Georgia. She said that the Defendant continued to drink as they drove and that he rubbed her head with a .25 caliber handgun. She said the Defendant forced her to feel his finger on the trigger and stated that he could kill her. She said that when a state trooper drove by, the Defendant pressed the gun against her stomach and said, "If he stops you know what's going to happen." She said that the trooper turned onto a different road and that the Defendant stated, "That's one lucky bastard, he gets to go home to his family tonight." They ate dinner at a steakhouse and returned to the Drama Inn.

The victim testified that she had a fever and continued to feel sick the next day. She said the Defendant never offered to get her medical treatment for her injuries. She said they traveled to Clingmans Dome to watch elk, bought fast food, and returned to the Drama Inn. She said the Defendant forced her to have sex with him that night. She said she woke up during the night and vomited. She said that the Defendant was awake and that he held the gun and watched her as she was sick.

The victim testified that on January 11, 2008, the Defendant told her they needed supplies because they were going to the mountains. She said that she walked to the hotel office to pay for the room and that the Defendant stood outside with the gun. She said the Defendant told her not to run because she knew what would happen if she did. She said the Defendant was nervous and told her to drive. She said that as they drove toward the Walmart in Clayton, Georgia, the Defendant said he wanted to stop and eat at Mama G's restaurant. She said she convinced the Defendant to purchase gas before going to eat. She said working at a bank taught her that credit card purchases at gas stations post to an account immediately

after the purchase. She said she hoped the police would be able to track the Defendant's purchase and search the surrounding area for her. After buying gas, they went to the restaurant and ate. She said the police surrounded the Defendant when they left the restaurant. She said she yelled, "He's got a gun in his pocket" and ran.

The victim testified that the police took photographs of her injuries in the restaurant parking lot and at the sheriff's station. She said that the local hospital did not have a rape kit but that her family drove her to a hospital in Bristol to administer one. She said she was truthful during her interviews with the police, including an interview with Detective Bedwell.

The victim testified that from the moment the Defendant kidnapped her at gunpoint, her only plan was to stay alive. She said the Defendant had .38 caliber gun, a .25 caliber gun, and a knife. She said she never had an opportunity to grab the guns because the Defendant kept the smaller one on him and the other next to him in the car. She said that the Defendant had a gun or was close to her at all times and that he woke up before her each morning. She said that she encouraged the Defendant to use his credit card everywhere they went to enable the police to track it and find her and that she tried to look at security cameras whenever possible. She said that she never consented to any of the Defendant's actions and that she followed his orders to gain more time to be discovered by the police. She said the Defendant occasionally stated that he would take her home and at other times would tell her that they were "not going to make it out of this." She said the Defendant told her once that she could call her family if she could refrain from being emotional and pretend they were on vacation. She said that she started crying and that she did not call because she was afraid he would kill her if she started crying on the phone.

The victim identified numerous photographs of her home, her car, the Drama Inn, and evidence taken from her car and from the Defendant. She identified a photograph of a hand towel and said the red stain on it was her blood. She identified a photograph of her basement window and said the window was large enough for the Defendant to climb through. She said the Defendant did not use zip ties to restrain her. She identified a photograph of ammunition and said the Defendant showed it to her and explained that he had modified some of the bullets to make hollow points.

The victim testified about a previous incident. She said that on December 1, 2007, the Defendant came to her home to drop off stone. She agreed to allow the Defendant to come to her home, and they discussed their pending divorce and finances. She said that the Defendant asked her out on a date and that she turned him down. She said she made it clear that she did not want to reconcile. She said that she walked to the bathroom to get a bandage for a cut on the Defendant's finger and that she placed the bandage on the Defendant. She said that the Defendant asked for a hug and that she refused. She said that the Defendant

grabbed her and shoved her against a door, causing her to fall to the floor and giving her a black eye, and that he held her down. She said she bit the Defendant's thumb when he covered her mouth with his hand. She said the Defendant moved his thumb under her tongue, cutting her mouth and causing it to bleed. She said the Defendant grabbed her by the throat, led her to her bedroom, and forced her to perform oral sex on him until he ejaculated. She said the Defendant drew his fist back and said he would punch her if she bit him. She said that the Defendant had blood on his penis afterward and that the blood stained his underwear. She said the Defendant threatened her as he left and said he would not go to jail. She said the Defendant told her that he had a gun in his car and that he would take her to the mountains and kill her before he killed himself.

The victim testified that she reported the attack to the police, that evidence was collected, and that an order was issued prohibiting the Defendant from contacting her. She said her father began staying with her after this incident. She said that a court hearing related to the attack was scheduled for January 9, 2007, that she planned to appear at the hearing, that the Defendant was required to appear, but that they missed the hearing. She said that when the Defendant kidnapped her in January, she did not resist or try to flee because the Defendant had "nothing to lose" and had previously attacked her and forced her to have sex with him.

On cross-examination, the victim testified that on January 4, 2008, the Defendant first took her to a parking lot at Lees-McCrae College near Banner Elk, North Carolina. She said that it was getting dark and that people were coming in and out of the parking lot. She did not know how far away the other people were or what time she and the Defendant left the parking lot. They stopped in Asheville for gas and found a nearby rest area to spend the night. She said the Defendant parked in a section of the rest area without other cars or lights. She said they saw people at Cades Cove the next morning. She agreed the Defendant stood beside her when they checked into the Drama Inn, and she said the Defendant stood outside but did not accompany her when she checked out. She agreed there were multiple instances between January 4 and January 11 when other people were nearby.

The victim testified that she did not know the location of the police station in Cherokee but that when she stood outside to smoke cigarettes, she noticed police cars and school buses drive by the Drama Inn. She said that the Defendant stood next to her when she smoked and that he had a gun in his pocket. She agreed she saw numerous police officers in Clayton. She agreed it was possible for her to scream or run but said she did not do either because she was scared of the Defendant. She said she became scared of the Defendant after he attacked her on December 1, 2007.

The victim agreed that although she generally complied with the Defendant's orders, she resisted him at her home, spat blood on the walls to let people know what happened, and unsuccessfully attempted to flee her home. She agreed her fear increased when they left her home. She said that the Defendant told her he "screwed up" and that he discussed killing himself because he said he had nothing to lose.

Alicia May testified that she was a registered nurse at the Bristol Regional Medical Center emergency room. She said the victim was visibly upset and had bruising near her eye when she came to the hospital on January 12, 2008. She said that she took the victim's patient history for purposes of diagnosis and treatment and that the victim told her she was raped and kidnapped by her estranged husband. She said the victim told her the Defendant penetrated her vaginally and anally. She said the victim's injuries were consistent with her patient history.

Ms. May testified that a rape kit was administered to the victim. She said a blood sample was taken, along with vaginal and anal swabs. She said that after the rape kit was completed, she sealed it and turned it over to the police.

On cross-examination, Ms. May testified that after she sealed the rape kit and turned it over to an officer, she had no further contact with it. She said her knowledge of the victim's patient history was provided by the victim and not by other sources. She said she did not discuss the history with the Defendant.

Agent Lisa Wessner testified as an expert in the field of serology. Agent Wessner said she analyzed the victim's clothing and the rape kit. She said she received samples of the victim's DNA and the Defendant's DNA for comparison to the clothing and rape kit. She said the sperm on the vaginal swab matched the Defendant's DNA sample. She said the probability that an unrelated person would match the Defendant's DNA profile was more than one in seven billion. She said that analysis of the anal swab and of the Defendant's underwear revealed the presence of limited sperm but that she could not obtain a DNA profile. She said she analyzed the victim's bedspread and determined that the victim's blood and the Defendant's semen were on the bedspread. She said she analyzed a brown hand towel belonging to the victim and determined that the victim's blood and the Defendant's semen were on the towel. She said that she analyzed swabs taken from red stains in the victim's home and that the only finding of blood came from the wall in the hallway. She said the swab from the hallway was a partial match for the victim's DNA profile. She said a Clorox wipe would degrade the quality of a blood sample and make it difficult to obtain a DNA profile because the wipe contained bleach. She said bleach could affect DNA. She said DNA could also be degraded by the passage of time. She did not find semen on the victim's pantyhose, pants, or sweater.

On cross-examination, Agent Wessner testified that time could affect samples of DNA differently, depending on the type of sample and its source. She said sperm generally could be recovered using a vaginal swab from twelve to seventy-two hours after it was deposited. She said that the time frame for sperm on an anal swab was twelve to twenty-four hours and that for an oral swab it was six to twelve hours. She said that Clorox wipes would have the same properties as a bleach solution but that she did not know how quickly bleach could degrade a DNA sample. She said a DNA sample could also be degraded due to its packaging, moisture, or sunlight. She was not able to determine why some of the samples in the rape kit could not produce a DNA profile.

Rabun County Sheriff's Lieutenant Jack Tanksley testified that he began investigating the victim's disappearance after receiving a telephone call from the FBI asking for assistance. He said his officers searched motels and rental properties for the victim's Honda Accord. He said that on January 11, 2008, he received word that the Defendant's credit card had been used at a gas station in Clayton and that a person called 9-1-1 and reported that a female with two black eyes was eating at Mama G's restaurant. He drove to the restaurant and saw the victim's car in the parking lot. Officers set a perimeter around the restaurant to avoid being seen by the Defendant, who was reported to be armed. He said that the Defendant and the victim walked out the restaurant's back door and that he arrested the Defendant. He said that the victim ran screaming from the parking lot and that she was hysterical and crying. He said that the Defendant had a loaded .25 caliber pistol in his front pants pocket and that he found a loaded .38 caliber pistol and a knife in a fanny pack between the seats of the victim's car. He identified a photograph showing the victim with two black eyes and said it was taken minutes after he arrested the Defendant.

Agent Joseph Thompson testified that he was employed by the FBI in Gainesville, Georgia. He and Lieutenant Tanksley coordinated an effort to locate the Defendant and the victim. On January 11, 2008, he received word that the Defendant's credit card was used at a gas station in Clayton and that the victim's car was seen at Mama G's restaurant. He began driving toward the restaurant but received instructions to go to the sheriff's department because the Defendant was in custody. He said that he met the victim at the sheriff's department and that she was relieved and thanked the officers. He said that she had two black eyes and a swollen nose and that she did not appear to be under the influence of alcohol or drugs.

Agent Thompson testified that he spoke with the Defendant at the sheriff's department and that the Defendant did not appear to be under the influence of alcohol or drugs. Agent Thompson said he inventoried the victim's car. He said that he found blue straps in the car and that the victim told him the straps were used to restrain her. He said the car also contained a .38 caliber revolver, ammunition for .38 and .25 caliber guns, a large Bowie

-11-

knife, a pocket knife, scissors, zip ties, an atlas, an empty liquor bottle, a bottle of vodka, several receipts, and a green duffel bag containing tools, a glass cutter, and window glaze. He sent the items to the FBI, and the items were eventually transferred to the Bristol Police Department. He identified numerous items of evidence he removed from the victim's car and identified photographs depicting evidence taken from the victim's car and from the Defendant.

On cross-examination, Agent Thompson testified that he found two types of ammunition in the victim's car. He said that none of the bullets had been hollowed out but that he could not tell if the bullets were tampered with. He agreed he found a large knife in a camouflage fanny pack in the victim's car. He agreed that he went through the duffel bag and that the majority of the items in the bag were construction tools. He said he thought the bag also contained beer bottles.

Doctor Howard Lovelace testified as an expert in ear, nose, and throat medicine. He said the victim was referred to him for treatment of nose-related pain and breathing problems. He said that she was suffering from a closed nasal fracture and a deviated nasal septum and that her injuries were consistent with injuries caused by blunt trauma to the nose. He said the patient history provided by the victim and his physical findings indicated that her injuries were recent. He said that he initially attempted to treat her without resorting to surgery but that surgery was necessary when the victim continued to have pain in her nose and difficulty breathing. On cross-examination, Dr. Lovelace testified that the victim's injuries could have been caused by different types of blows to her nose.

The victim's father testified that he began staying with her every night after the incident on December 1, 2007. He said he visited her in the hospital that night and saw her injuries. He spoke with the victim four or five times a day until she disappeared on January 4, 2008. That morning, she told him she would be going out with friends that night. He said he tried calling her that afternoon but was unable to reach her. He said she always called him or returned his calls. He drove by her house that night and saw that the outside lights were on and her car was missing. He said the lights were still on when he returned the next morning. He said that the exterior door to her bedroom was unlocked and that he entered the house. He found her pocketbook, cell phone, and epinephrine pen in the house. He said she always carried her epinephrine pen because she had allergies. He said that her dogs were in the house, that they were hungry and needed water, and that they "messed" all over the house, which he said was very unusual because the victim never forgot to feed them or let them outside. He called family members and the police. He said he did not hear from the victim until after the Defendant was arrested and she called him to come get her. He brought her home, and her mother took her to the hospital. He said the victim had a black eye, a

distorted nose, and appeared to have been "beaten up." He said she did not have any of her injuries when he last saw her on January 3.

The Defendant testified that he disagreed with the victim's testimony. He said that he was married to her for about ten years and that they separated and reconciled "about once a year." He said that their relationship changed on December 1, 2007, and that instead of dating in public, they began "sneaking around" to see each other. He said they hid their relationship because a court order prohibited him from contacting her and they did not want their families to know they were seeing each other. He said that he continued to have contact with her after December 1 and that they would meet in parks and parking lots to discuss their relationship. He said the victim also sent him emails and text messages.

The Defendant testified that on January 4, 2008, he went to Lowe's to buy supplies for work and to fix a window at his home. He worked as a superintendent for the Burwell Construction Company. He said that he placed his tools in a green duffel bag to prepare for work but that some of his tools remained at the victim's home after they separated. He said that Mr. Smith came to his home and that they drove by the bank where the victim worked to put a note on her car asking her to call him. He said that they returned to his house briefly but that he asked Mr. Smith to drive him to the victim's home in order to retrieve his tools from the basement. He said he told Mr. Smith that he would call him later in the day but disagreed that the purpose of the call was to have Mr. Smith give him a ride. He said he entered the basement through a window because he did not have a key. He said that he and his son previously lived with the victim at her home and that neither he nor his son ever had a key. He said that when he entered the house, his only intent was to retrieve his tools. He said he gathered his tools, placed them in his duffel bag, and walked upstairs to gather other items he left behind when he moved out. He gathered more tools and a camouflage jacket and put them with his duffel bag in the basement.

The Defendant testified that he returned upstairs, visited with the victim's dogs, and took the dogs outside. He said that he called Mr. Smith around 2:00 p.m. and asked for a ride but that Mr. Smith was busy painting and said he would call the Defendant later. He said that he previously learned that the victim began smoking and that he looked in her dresser drawer to see if she had cigarettes. He said that he found a revolver in the drawer and that he took it out to look at it. He said that he walked to the front bedroom when a dog barked and that the victim walked into her home, saw him, and asked why he was there. He stated that he held the gun in his hand and that he asked the victim why she had a gun in her home. He said she slapped the gun out of his hand, causing the holster to fall to the floor and the gun to land on the bed. He said that she grabbed the gun and that he jumped on top of her and took the gun because he was scared. He said he got up, placed the gun on the side table, and bent down to retrieve the holster. He said that she grabbed the gun again and that he dove at her

to get the gun and accidentally hit her on the bridge of her nose with his head. She handed him the gun.

The Defendant testified that he did not see the victim bleed because she went to the bathroom. He said that he also went to the bathroom to spit out his chewing tobacco and that he asked her if she was all right. He said that he cut his finger lunging for the gun and that he went to the kitchen to run water on his hand. He said the victim walked into the kitchen to see what he was doing and went to her bedroom to change clothes. He said he walked to the bedroom and helped her remove her pantyhose at her request. He heard a car door close outside and walked to the front bedroom to see if anyone was at the house. He said that the victim followed him into the bedroom and that she lay down on the bed and began using a vibrator. He said he massaged her back and her buttocks. He said that when she finished, they removed his pants and she stimulated him with the vibrator. He said the victim retrieved a hand towel and wiped their genitals with the towel. He said his semen and her blood were on the towel and on the bed comforter because he ejaculated and she was menstruating. He said that he did not have vaginal sex with her at any time that day because she was menstruating and that he did not have oral or anal sex with her. He said that the revolver was in his back pocket but that he did not display the gun.

The Defendant testified that after they dressed, he walked to the kitchen and noticed stains on the wall. He said that he thought he bled on the wall when he cut his finger and that he asked the victim to find him something to clean the wall. He said that she cleaned the wall and that they sat in the kitchen and talked as they drank beer and put away groceries. He told her that he wanted to leave because they could not be seen together and asked her for a ride home. He said he gathered his duffel bag, using blue straps to tie his camouflage jacket to the outside of the bag, and placed the bag in the victim's car. He said that his intention was to have her take him home but that they discussed going for a ride and talking. He said she walked out of her home carrying the gun, told the Defendant, "you've lost your gun," and handed it to him. He said that he asked her what he should do with the gun and that she told him to place it in the trunk next to a bag of potatoes. He said she also carried a white bag containing beer and cigarettes. He said that she did not have her purse or her cell phone and that he did not tell her to leave those items behind. He said Mr. Smith called him but he did not answer because he did not need a ride. He said he turned off his telephone. He said that the victim handed him her car keys and that they left.

The Defendant testified that they drove to the Volunteer Parkway, instead of going to his home, because the victim told him that people she worked with lived near his home and that she did not think she should be seen at his home. He said they agreed to drive a large loop through Elizabethton. They drove past Elizabethton and stopped at a store near Banner Elk, North Carolina, to use the restroom. They later stopped at a parking lot in Banner Elk

to watch children sleigh riding and to determine how to get home. He said they discussed a time they had sex in a car wash shortly after they began dating. He said they had sex in the parking lot after the victim climbed on top of him and initiated the sex. He said that he did not force her to have sex and that the revolver was in the trunk of the car.

The Defendant testified that they drove toward Asheville after deciding to go to the Biltmore Estate. They stopped for gas and food in Asheville. He did not remember if the victim got out of the car while he pumped gas. He said they decided to return home because it was getting late. He said they spent the night at a rest stop because they were both tired and not familiar with the area. He said they tied straps around each other because they saw a "big white truck" in the parking lot and did not know if someone was trying to do something to them. He said that using the straps was his idea but that he discussed it with the victim before they tied themselves together. He said he did not force her to use the straps.

The Defendant testified that they began driving home the next morning but that they decided to go to Cades Cove because they were nearby and had been there previously on a family vacation with his son. He said it was the victim's idea to go to the cove. He said that they decided to drive toward Cherokee to search for a restaurant because it was closer than Gatlinburg and that they decided to spend the night at the Drama Inn. The victim checked into the hotel. He said that he never saw the hotel registry and that he did not tell her to provide a false name or license plate number. They purchased food, returned to the hotel, showered, and went to sleep. He said that he did not force the victim to sit in the bathroom while he showered and that he did not remove the telephone from the hotel room. He said he did not have sex with her that night because they were both tired. He said that he did not tie her to him that night and that other than the night they spent at the rest stop, he never used the straps for any purpose. He said that he had not removed the .38 caliber revolver from the trunk and that he did not know he had a .25 caliber pistol at the time, but that he later discovered the pistol in his duffel bag.

The Defendant testified that they drove to a Walmart in Spartanburg the next morning to buy clothes and supplies. He said they had not planned being away from home until the previous night, when they decided to spend a few days in Cherokee. He said he did not force the victim to stay. He said that he did not know if she would miss work but that he did not stop her from using the telephone to call her employer. He said that they bought food, clothing, and toiletries and that they were not always together while in the store. He said that he did not take a weapon into the store, that he did not remove the revolver from the trunk, and that he was still unaware a pistol was in his duffel bag. He said he never told the victim that "the first four bullets" were for her. They bought a pizza and drove back to the Drama Inn. He said he discovered the .25 caliber pistol in his duffel bag as they unloaded the car.

-15-

He said that he did not know how the gun got into his bag and that he did not place the gun there. He said that he showed the gun to the victim but that he did not point it at her. He left the pistol in the car but placed the revolver in a fanny pack and brought it into their hotel room. They watched television, went out for dinner, and played cards.

The Defendant testified that they went to a park the next day. He was not sure if they went to a bank in Asheville that day, but he said they went to two banks to withdraw cash. He said he was aware that day that he had an upcoming court hearing. He said that he intended to be back in time for the hearing and that the victim was going to help him at the hearing. He said they missed the hearing, though, because they decided to stay in Cherokee. He said he did not force the victim to stay.

The Defendant testified that they bought liquor and went to a Walmart in Clayton, Georgia. He said that buying liquor was the victim's idea and that she drank most of it. He remembered that she was congested and said they went to a CVS pharmacy to buy sinus medication. They also bought a notebook to record the scores of their card games. The Defendant identified an exhibit containing receipts recovered by the police, and he said the CVS receipt and a Walmart receipt were missing. He said that although the victim's bruises grew worse as the week progressed, he did not deny her medical attention. He said that he asked her if she wanted medical attention and that she said no. He said he did not hit her the entire time they were away from home. He said that the victim sat outside and smoked while they were at the hotel and that she regularly stepped outside without him. He said he occasionally stood outside and spoke with her as she smoked.

The Defendant identified a picture of the Drama Inn and testified that the picture showed the Cherokee Veterans Park and the police station. He said they saw state troopers at the station and unmarked cars that appeared to be local police.

The Defendant testified that he had sex with the victim at the Drama Inn but could not remember which nights. He said that they did not have sex every night, that he never held a gun while they had sex, and that he never forced her to have sex. He said he never threatened her with a weapon.

The Defendant testified that on January 11, 2008, he did not stand outside and watch the victim as she went to the hotel office. He said he was putting dirty clothes in the car as she went to the office. He said they left and drove toward the Walmart in Clayton, Georgia, to get supplies because they planned to go to Gatlinburg before returning to Bristol. He said he had a .25 caliber pistol in his pocket when they ate at Mama G's restaurant. He said that he took the pistol out of the duffel bag when he removed his tools from the bag and that he forgot he had it.

-16-

The Defendant testified that between January 4 and 11, 2008, he never threatened the victim with a gun. He said he never forced her to go anywhere or confined her against her will. He said he never had sexual contact with her without her consent. He said that he did not enter her home with the intent to commit a crime and that he did not intentionally cause the injury to her nose and face.

On cross-examination, the Defendant agreed that his relationship with the victim changed on December 1, 2007. He agreed that she called the police, that he was arrested, and that he was released on bond. He agreed that on December 3, 2007, a court order was filed prohibiting him from contacting, seeing, or being near the victim or her home. He agreed the order stated that only the court could release him from those conditions and that the victim could not release him. He agreed the court did not release him from the no-contact conditions before January 4, 2008. He agreed he saw the victim despite the court order. He agreed he drove by her home multiple times in Mr. Smith's truck, and he said he and the victim had a system where she would leave a light on if she wanted to meet him. He agreed that when he and the victim left her home on January 4, he knew he had a pending court date on January 9, 2008, concerning a criminal charge resulting from the events on December 1, 2007. He said he knew that the victim planned to appear and testify at that hearing and that she was the only witness to the events on December 1.

The Defendant agreed that the victim planned to help him with the hearing. He said she was going to tell his attorney that he did not hit her or force her to perform oral sex on December 1, 2007. He agreed that neither of them appeared at the hearing because they were traveling.

The Defendant agreed that on January 4, 2008, he and Mr. Smith drove by the victim's home and workplace. He said they never left a note on her car because the bank parking lot was full. He agreed that he bought materials at Lowe's to fix his window, that he returned home and put the items in a duffel bag, and that he took the bag to the victim's home. He said Mr. Smith was supposed to pick him up later when he called but agreed Mr. Smith testified that he had not arranged to give the Defendant a ride. He said Mr. Smith lied. He agreed that the victim did not know he was at her home and that she did not give him permission to be there. He agreed he entered through a locked basement window. He denied that he used the glass cutter to open the window and said he removed a window pane that was already loose and unlocked the window. He said that he never had a key to the home and that he and his son previously entered through the window when they lived there.

The Defendant agreed that he gathered tools at the victim's home and placed them in his duffel bag. He agreed that he took things out of the bag, that a gun was also in the bag, and that he did not know the gun was there until he discovered it in Cherokee. He agreed a

court order prohibited him from possessing a gun. He agreed that he found a gun in the victim's dresser and took it. He agreed that she was surprised to see him when she arrived home and that they immediately struggled to gain control of the gun, despite being on good terms and frequently seeing each other clandestinely. He said she may have been startled to see him holding a gun.

The Defendant agreed that during the struggle for the gun, his head hit the victim's face. He agreed he did not see any blood. He agreed that Agent Thompson interviewed him on January 11, 2008, and that Agent Thompson took notes. He said he had not seen the transcript of the interview. He agreed he did not tell Agent Thompson that he head-butted the victim but denied telling Agent Thompson that he slapped the victim's face. He agreed he told Agent Thompson that he hit the victim with his forearm while struggling to gain control of the gun.

The Defendant agreed that the victim used a vibrator on herself and on him. He agreed he did not mention the vibrator in his interview with Agent Thompson, but he said he attempted to tell another officer about the vibrator but stopped when the officer said, "Oh, hell, you're not going to tell me you all used that." He agreed that during an interview with Agent Thompson, he said he and the victim did not do anything sexual at her home on January 4, 2008. He agreed he did not know that Agent Wessner would analyze the victim's towel or bedspread and find his semen on those items. He agreed that he thought the blood on the wall was from a cut on his finger and that he did not tell Agent Thompson he cut his finger. He said he could not explain why the victim's blood was in the hallway.

The Defendant agreed that the victim left her purse, cell phone, and epinephrine pen at her home when they left. He agreed they stopped and had sex in a parking lot that night. He agreed she initiated the sex, and he said she had been drinking. He agreed that he testified during direct examination that he did not have sex with the victim at her home because she was menstruating. He agreed they drove to Asheville that night and that they stayed at a rest stop, despite hotels being nearby. He agreed they tied straps to themselves and to each other for protection, despite having a loaded gun in the trunk. He denied telling Agent Thompson that he tied the straps to the victim to prevent her from running away. He agreed Agent Thompson's notes from the interview said, "[the Defendant] advised me that this was to keep her from running away and in effect it would have him wake up from feeling the strap move." He said that he never read or signed the interview notes and that the notes were not accurate.

The Defendant agreed that he never took the victim to a hospital and that he testified during direct examination that her swelling got worse as the week progressed. He agreed that she wore sunglasses in security footage from the bank and Walmart and that she wore

sunglasses each time they went out during the day. He did not know if he ever used his credit card in Cherokee but agreed he used it at other places as they traveled. He said they drove by the main road near the police station in Cherokee but agreed they never drove down the road that went directly past the station. He said that he did not make any telephone calls while they traveled and that he never saw the victim use a telephone.

The Defendant agreed that he had a loaded gun in his pocket when he was arrested. He said the victim never knew he had the gun. He could not explain why the first thing the victim said at the time of his arrest was that he had a gun. He could not explain why she was hysterical and crying at the time of his arrest or why officers testified that she was relieved to see them and thanked them. He said she may have acted relieved to prevent the police from charging her with aiding and abetting.

On redirect examination, the Defendant testified that he did not know why there were differences between his testimony and the interview notes taken by Agent Thompson. He said that he told the truth and that he told Agent Thompson the same things he told the jury. He said he did not prevent the victim from attending and testifying at the hearing on January 9, 2008. He said they agreed not to attend the hearing. He said that he did not prevent the victim from contacting anyone while they traveled and that she was free to call anyone. He said he did not contact anyone because he was not supposed to be with the victim and because they were attempting to figure out how she could assist him at his hearing without getting into trouble for falsely accusing him. He said that although he did not drive on the road that went directly in front of the police station, he could see the station from a parallel road. He said he and the victim knew the building was a police station because they saw police cars there.

In rebuttal, the victim agreed that the Defendant attacked her on December 1, 2007, and that he forced her to perform oral sex. She agreed that she reported the attack to the police and that she gave a description of the attack to Detective Bedwell that was consistent with her testimony at trial. She said that she testified consistently at previous appearances and that she never testified inconsistently regarding the attack. She said she never gave an inconsistent statement regarding the attack to anyone. She said she never told the Defendant that she would tell his lawyer her accusation was just a misunderstanding.

Upon this evidence, the Defendant was convicted by a Sullivan County Circuit Court jury of especially aggravated kidnapping, four counts of aggravated rape, aggravated assault, and aggravated burglary. This appeal followed.

**I**

The Defendant contends that the trial court erred by admitting evidence of his actions on December 1, 2007, which gave rise to his previous conviction for aggravated rape against the victim. He argues that the trial court abused its discretion when it found that the evidence was relevant to establish a material issue other than conformity of action, and that the probative value of the evidence was outweighed by the danger of unfair prejudice. The State contends that the trial court did not abuse its discretion and properly determined that the evidence was admissible under Tennessee Rule of Evidence 404. We conclude that although the danger of unfair prejudice increased when the victim was permitted to describe the Defendant's previous aggravated rape in great detail, any error in admitting the testimony was harmless in light of the evidence against the Defendant.

Tennessee Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The Defendant argues that the trial court abused its discretion because there was no chronological or conceptual void in the State's case sufficient to establish a material issue other than conformity of action and because the probative value of the evidence was outweighed by the danger of unfair prejudice. The Defendant cites State v. Gilliland, in which our supreme court held that

> in terms of Rule 404(b), when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

22 S.W.3d 266, 272 (Tenn. 2000). In Gilliland, the supreme court's analysis regarding background evidence focused on such evidence's relevance to material issues in the case, the need to present the evidence to prevent confusion, and the weighing of its probative value against the danger of unfair prejudice. See id. at 270-273. Each of these three factors must be considered and found before the evidence is admissible. We note that unlike the trial court in Gilliland, which found that the evidence of prior acts involving the defendant and the victim was material only to provide a contextual background, the trial court here concluded that the evidence was relevant to determine intent and motive, as well as to provide a contextual background. We agree that the evidence was relevant to establish motive and intent. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993) ("Violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim.").

With regard to motive, the evidence reflected that the Defendant had a court date on January 9, 2008, concerning the previous attack at which the victim planned to testify. Neither of them appeared at the court date. The Defendant's actions and his threat on December 1, 2007, that he would take the victim to the mountains and kill them both before he would go to jail, was also relevant to establish his intent and why the victim did not resist the Defendant or seek help while in public. The evidence also established that the Defendant's use of force against the victim was not accidental or consensual because it showed that he previously used force against the victim after she rejected his attempt to reconcile. Because the evidence of the Defendant's acts on December 1 was relevant to

establish material issues other than a contextual background, a chronological or conceptual void was not required to render the evidence admissible. See State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004) (holding that the trial court did not commit error by admitting contextual evidence, despite lack of Gilliland findings, when evidence was also offered to show motive).

Although relevant, evidence of previous acts must not be admitted if the probative value of the evidence is outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b). The potential for prejudice increases when previous conduct or bad acts are similar to the crimes for which the defendant is on trial because the jury could convict "'on the perception of a past pattern of conduct, instead of on the facts of the charged offense.'" State v. James, 81 S.W.3d 751, 762 (Tenn. 2002) (quoting State v. Mallard, 40 S.W.3d 473, 488 (Tenn. 2001)). We also note that "Rule 404(b) constitutes a more restrictive admissions test, excluding evidence more frequently than the test in Rule 403." James, 81 S.W.3d at 759 n.6; see also State v. Rounsaville, 701 S.W.2d 817, 820 (Tenn. 1985) ("[the] starting point in considering testimony regarding prior offenses [under Rule 404(b)], when offered as substantive evidence of guilt and not merely for purposes of impeachment, is a rule of exclusion").

Although the evidence was probative of intent and motive, the trial court allowed the victim to describe the incident on December 1, 2007, at length and in great detail. The trial court admitted far more detail than was necessary to establish that the Defendant previously attacked the victim after she refused to reconcile, that he was arrested, that the Defendant threatened to kill the victim if confronted with incarceration, and that the victim planned to appear at the Defendant's hearing on January 9, 2008. A basic description of the events on December 1 would not have presented the same danger of unfair prejudice.

Although the danger of unfair prejudice increased when the victim was permitted to describe the Defendant's previous aggravated rape in great detail, we conclude that any error in admitting the evidence was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(a). The Defendant contends that the trial court's error affected the judgment because the exclusion of the evidence would have called the credibility of the state's witnesses into question. We disagree.

Mr. Smith testified that on the day of the kidnapping, he attempted to persuade the Defendant against going to the victim's house. He said the Defendant stated that he wanted to catch the victim, that he was not sure what he would do but that he had "to do it," and that he was "cold." He said he did not arrange to provide the Defendant a ride later that day,

which was contrary to the Defendant's testimony. The victim testified that the Defendant attacked her in her home, broke her nose, forced her to have sex, and forced her to travel with him. The Defendant claimed that the victim voluntarily engaged in sexual activity immediately after the attack, despite the victim's suffering from a closed nasal fracture and a deviated nasal septum. The Defendant agreed that he initially told Agent Thompson he and the victim did not do anything sexual at her home on January 4, 2008, and that he did not know that Agent Wessner would analyze the victim's towel or bedspread and find his semen on those items. Agent Wessner testified that the Defendant's semen was found on the victim's bedspread, her hand towel, and on a vaginal swab. The victim testified that after the attack, she spat blood on the wall to provide evidence of the attack. Agent Wessner testified that the victim's blood was found on the bedspread, the hand towel, and in the hallway. The Defendant could not explain why the victim's blood was in the hallway.

The Defendant testified that he was unaware he had a .25 caliber gun in his pocket at the time of his arrest and that the victim never knew he had the gun. However, when police confronted the Defendant, the victim immediately told them the Defendant had a gun, ran away crying, and thanked the officers. The victim's father also testified that the victim did not take her epinephrine pen with her or ensure that her dogs were taken care of when she left, which was unusual and not like her. Given the evidence against the Defendant, we do not believe that the jury's hearing about the details of the Defendant's previous bad acts more probably than not affected the result of the trial. See T.R.A.P. 36(a). The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred by enhancing his sentence based upon enhancement factors not found by the jury or admitted by the Defendant, which he asserts is in violation of Blakely v. Washington, 542 U.S. 296 (2004), and Gomez v. State, 239 S.W.3d 733 (Tenn. 2007). The State contends that the Defendant was sentenced pursuant to the 2005 amendments to the Criminal Sentencing Reform Act, which permitted the trial court to consider enhancement factors not submitted to the jury or admitted by the Defendant. We agree with the State.

At the sentencing hearing, the trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114 (Supp. 2007) (amended 2008): (1) the Defendant had a previous history of criminal convictions, in addition to those necessary to establish the appropriate range; (5) the Defendant treated the victim with exceptional cruelty during the commission of the offense; (6) the personal injuries inflicted upon the victim were particularly great; (7) the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement; (9) the Defendant possessed or

employed a firearm during the commission of the offense; and (13) the Defendant was released on bail at the time the felony was committed. The trial court found that the following mitigating factor applied pursuant to Tennessee Code Annotated section 40-35-113 (2010): (13) the Defendant had an excellent work history. He was sentenced as a Range I, standard offender to twenty-five years' confinement for especially aggravated kidnapping, twenty-five years' confinement for each aggravated rape conviction, six years' confinement for aggravated assault, and six years' confinement for aggravated burglary. The kidnapping conviction was ordered to be served consecutively to the remaining convictions, for an effective sentence of fifty years.

The Defendant's reliance on Blakely and Gomez is misplaced. In Blakely, the Supreme Court held, "If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." Cunningham v. California, 549 U.S. 270, 290 (2007) (citing Blakely, 542 U.S. at 305). In order to avoid the constitutional violation arising from a trial court increasing a presumptive sentence on the basis of judicially determined enhancement factors that were not submitted to the jury, the Tennessee Legislature amended the Criminal Sentencing Reform Act in 2005. The Sentencing Act no longer imposes a presumptive sentence and instead states that the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210 (2010). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting T.C.A. § 40-35-210(d)). The 2005 amendments permit the trial court to consider enhancement factors not submitted to the jury or admitted by a defendant. We hold that the trial court did not err by considering enhancement factors that were not submitted to the jury or admitted by the Defendant.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE